RAILWAY EXPRESS AGENCY, INC., *v.* H. ROUW COMPANY.

4-5497 128 S. W. 2d 989

Opinion delivered May 29, 1939.

*Paul E. Gutensohn* and *Warner & Warner,* for appellant.

*Howell & Howell,* for appellee.

SMITH, J. There is no essential or controlling distinction between the instant case and the recent case of *Railway Express Agency, Inc.,* v. *H. Rouw Co.,* 197 Ark. 1142, 127 S. W. 2d 251. The law of the subject was examined and reviewed at some length in that opinion, and to discuss the questions of law here involved would be to repeat what was there said, indeed, a substantial part of the brief for appellee in the present case is a reprint of the brief in support of the petition for rehearing in the former case.

Both appeals were from judgments awarding damages arising out of carload shipments of strawberries. In the former case it was said that the suit was based upon a contract evidenced by the bill of lading or express receipt. The instant suit was of the same nature, but it is recited in the bill of exceptions that counsel for plaintiff below—appellee here—said: "At this time and before there is any evidence taken in the case, the plaintiff states, in open court, to the court and jury, that it elects to try this case on the defendant's common-law duty or liability and does not in any manner attempt to allege or try this case on any specific act of negligence, but on the contrary, we are strictly relying on the defendant's common-law liability."

There is, therefore, this apparent difference between the two cases, but in the former opinion it was said: ". . . even if we test appellee's right to recover in these cases, on appellant's common-law liability, which only requires appellee to show that it delivered the berries in a good condition, and that they were delivered at destination points in a damaged condition, in order to establish a *prima facie* case of negligence against appellant, still we hold that appellant has successfully overcome this *prima facie* case made by appellee, and that the evidence falls far short of being of that substantial nature required by the decisions of this court to afford a recovery." The opinion then proceeds to show, under the law applicable to that issue, why there was no common-law liability, as distinguished from contractual liability. So that, as has already been said, this case is governed by the law as thus declared, as there is no substantial difference in the testimony appearing in the record in the instant case from that which appeared in the former.

The complaint in the instant case contained ten counts, each involving a carload shipment of strawberries. Verdicts were returned for $231.75 and $140.40, respectively on counts 4 and 10, being the amounts sued for in each of those counts, and this appeal relates only to those two counts of the complaint. The car of berries involved in count 4, which, for convenience, we will designate as

car 4, was shipped from Russell, Arkansas, to Buffalo, New York. In count 10 the car of berries, which we will designate as car 10, was shipped from Russell, Arkansas, to Cleveland, Ohio. The cars were billed to St. Louis, with the right reserved, which was exercised in each case, to divert or to continue the shipment to some other destination. The shipper negotiated and arranged by wire for the disposal of the berries after the cars were in transit, so that, in many, if not in most, instances, the final destination of a car was unknown, even to the shipper, when it started rolling.

North Little Rock, was a concentration point for refrigerated cars used in such shipments, and the undisputed testimony of the inspectors shows that the cars here in question were properly inspected at that point. The inspections were carefully made by experienced employees, who made a complete inspection, and both cars were found to be in good condition for shipping berries. The records of those inspections concerning which the inspectors testified show that those cars were in good order, and that the drip pans and the drain pipes were in perfect condition. Indeed, it is not contended, and no attempt was made to show, that proper cars were not furnished.

The inspection records also show without dispute that before the cars were shipped to Russell, the point at which they were loaded, 6,000 pounds of ice were placed in the front bunker of each car, and the same quantity of ice was placed in the rear bunker of each car. This was the full capacity of the bunkers. Car 4 was thus iced at 10:10 p. m., May 5th, and the icing of car 10 was completed at 10 p. m. on the same day. Both cars left North Little Rock for Russell at 11:50 p.m., May 5th. A route agent of the defendant express company kept a written log book, detailing the handling of each car and the loading of the berries therein from the time the car arrived at Russell until it was forwarded. The record thus kept showed that both cars were re-iced to full capacity at Russell before being forwarded. The cars were again inspected at Russell and found to be in good condition in every respect. The detailed inspection report covered all

parts of the car and its equipment. The inspector representing the consignor was also present, and it was his duty to inspect the car. The blank report furnished for his use required him to examine the car and its equipment and to report any defect found. Neither of his reports on these two cars showed any defect of any kind in the cars or in their equipment.

The loading of car 4 was commenced at 2:25 p. m., May 6th, and was completed at 9:15 p. m. on the same day. The loading of car 10 was commenced at 4:50 p. m., but was not completed until 8:15 p. m. the following day. This was a delay for which, of course, the carrier was not responsible.

It was shown that cars may be precooled, and that the purpose of this operation was to reduce the temperature of the berries by eliminating field heat, and is a service performed by the shipper, and not by the carrier, and the operation requires about four hours. Car 4 was the only one precooled, and this was done for only an hour and twenty minutes. Equipment for this purpose consists of a blower fan, operated by electric or other power, placed inside the car at the top of the ice bunker, blowing the cool air through the car and its contents.

When loaded, both cars were billed to St. Louis, but that city was not the final destination of either car. While the cars were rolling the shipper was looking for purchasers, and the cars were diverted when a purchaser was found. As to car 4 there was no delay in the diversion at St. Louis. There was a delay in the diversion of car 10 at St. Louis before it was forwarded to Cleveland. Car 4 was promptly diverted to Buffalo, but there was a delay of 16 hours in effecting a diversion of it from Cleveland to Buffalo, New York, its final destination. There appears to have been a delay of about 62 hours in unloading the car at Buffalo after its arrival there. When the diversion was made the original express receipt was surrendered and an exchange receipt given, but the duty of the carrier remained unchanged.

It was affirmatively shown that there was no delay in forwarding either car on the first available train. No

negligence in transportation was alleged, and the affirmative and undisputed proof is to the contrary.

On account of delay in loading car 10 at Russell it was necessary to re-ice it a second time, and that was done. The progress of both cars to their final destination was traced, and it was shown that both were re-iced at Poplar Bluff, a point 125 miles north of Russell. Upon arrival at St. Louis the cars were again inspected and re-iced, and before leaving St. Louis they were again iced, indeed, car 10 was so long delayed at St. Louis that it required and was given an additional re-icing. As the cars proceeded to their respective destinations they were both re-iced at the regular icing stations. The periods of time between re-icing extended from 3½ to 14 hours. Inspections were made at each of the re-icing stations, and nothing was found at any of them to suggest deficient refrigeration. The bunkers showed only normal meltage of the ice, and both bunkers were filled in every instance to full capacity.

Prompt notice was given of the arrival of both cars at final destination, and a prompt inspection was made by a competent inspector representing the Railroad Perishable Inspection Agency, which is referred to as RPIA. Some deterioration was found in both cars, which was not very extensive in either. It was alleged that the damage to the berries amounted, in one car, to $231.75, and $140.40 in the other, these amounts being the difference between the price the berries would have sold for had they been in good condition and the price for which they did sell on account of their damaged condition.

The testimony is sufficient to show damage in the sums alleged and found by the jury, and the question in the case is whether the carrier's negligence caused this damage. The shipper makes a *prima facie* case when he shows that sound berries were delivered for shipment, and that the berries were in a damaged condition upon arrival at their destination. But the carrier is not an insurer against such damage, and it discharges its liability therefor when, and if, it shows that ordinary care was employed by it in the shipment. The opinion in the for-

mer case, hereinabove referred to, discusses the law upon that subject, and the discussion will not be repeated here.

The RPIA inspectors who inspected the cars upon arrival at destination testified that the damage found, which they called botrytis and other technical names, was caused by the inherent nature of the berries, and was of a field origin. The carrier was not responsible for damage thus caused.

It is said the RPIA inspectors are mere agents of the carrier. Even so, their testimony is undisputed, and there is nothing to contradict their reports. But it does not appear to be true that they were the agents of the carrier. On the contrary, the blanks furnished for the reports of these RPIA inspectors contained the direction, "If carrier disputes your inspection, get disinterested party or parties to inspect shipments and make written report." There was no dispute of their inspection at destination and disinterested persons were not called to check the inspection.

It is true one T. O. Cole, of Ft. Smith, testified that if the berries had been properly iced they "would have stood up" for five or six days, and no deterioration would have occurred within that time, and both shipments were completed within that time. Mr. Cole has no interest in this litigation, except that he is himself a berry shipper, but he did not see the berries either at the point of shipment or at destination, and knew nothing of the condition of the berries at either place. No one contends that any refrigeration, however perfect, could improve the condition of the berries. It is insisted only that proper refrigeration would retard deterioration.

The temperature of car 4 was taken upon its arrival at Buffalo, and was found to be 45 degrees at the top of the car and 42 degrees at the bottom. Car 10 was found upon its arrival at Cleveland, to have a temperature of 45 degrees at the top and 40 degrees at the bottom, and numerous witnesses testified that this, for all practical purposes, was as low a temperature as could be obtained, unless the ice were salted, this being a service not furnished unless requested, and for which an additional charge was made, if furnished.

The testimony shows that after car 4 was accepted for delivery there was a delay of 37½ hours in unloading it, and that after car 10 arrived about 36 hours elapsed before unloading started and an additional delay of about 48 hours occurred before unloading was completed. But, as the undisputed testimony shows, the carrier had already discharged its duty upon the delivery of the car, and it is not responsible for damages which occurred thereafter.

It was said in the case of *Railway Express Agency, Inc.,* v. *S. L. Robinson & Co.,* 184 Ark. 660, 43 S. W. 2d 543, that when the shipper proves delivery of the commodity in good condition, and failure to re-deliver in good condition, a *prima facie* case is made, and the burden shifts to the carrier to show that its negligence did not cause the damage which accrued to the commodity in its shipment. But it was held in that case that the carrier may show that it was not responsible for the damage, and in holding that the carrier had discharged this burden in that case it was there said: "The carrier did not content itself with introducing witnesses as to the general condition of the shipment of strawberries while in its hands, but introduced all persons employed by it who had part in the different transactions during transit. We do not mean that all the operatives of the train were introduced as witnesses, but we do mean that the carrier followed the shipment step by step from the place of shipment to the place of delivery. It was shown by competent evidence that a refrigerator car of the most approved type was furnished the shipper within which to carry the berries. The condition of the car and its material, both as to its equipment and construction, were detailed by the witnesses. It was shown that the carrier had a sufficient number of stations along the route for re-icing the car and that the car was properly inspected and well iced at all these stations. The evidence shows that the car of strawberries was in good condition at all these points. The car was diverted by the shipper from Kansas City, Missouri, to Chicago, Illinois. As soon as it arrived at its destination, the consignee was notified. An examination of the berries was made when they arrived at their

destination, and they were found to be full ripe and watery. None of the crates were broken or damaged."

In this case, as in the Robinson case, *supra,* none of the crates were broken or damaged, and it appears, from the facts herein recited, that appellant carrier has, in like manner, overcome the *prima facie* case, and the judgments must, therefore, be reversed, and as the causes sued upon appear to have been fully developed, they will be dismissed. It is so ordered.